

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

ENTERED
03/05/2012

| | | |
|---|---|---|
| IN RE: § | CASE NO. 11-36667 | |
| BRYAN and TRENELL FRAZER, § | Chapter 13 | |
| § | | |
| Debtors § | | |

| | | |
|---|---|---|
| BRYAN and TRENELL FRAZER, § | ADVERSARY No. 11-03484 | |
| Plaintiffs § | | |
| § | | |
| v. § | | |
| § | | |
| PROPERTY OWNERS ASSOCIATION OF § | | |
| CANYON VILLAGE AT CYPRESS § | | |
| SPRINGS, § | | |
| Defendant. § | | |

**MEMORANDUM OPINION ON PLAINTIFFS' COMPLAINT FOR DETERMINATION
OF LIEN STATUS AND REMOVAL AND
<u>RELEASE OF LIEN</u>**
[Adv. Doc. No. 1]

## I. INTRODUCTION

This adversary proceeding concerns, ultimately, whether the debtors' Chapter 13 plan will be able to "strip" the lien on their homestead held by a homeowners' association. The debtors seek a declaratory judgment that: (1) the lien held by the homeowners' association on their homestead is subordinate to the lien held by the home lender; and (2) because the home lender's lien exceeds the value of the homestead, the lien of the homeowners' association may be "stripped" so that the association is required to release its lien and be paid under the debtors' Chapter 13 plan as an unsecured creditor. The association vigorously opposes the relief sought by the debtors. It contends that under the recorded instruments in the real property records of

Harris County, Texas, its lien is superior to the home lender's lien and, therefore, may not be "stripped" under the debtors' plan. For the reasons set forth herein, this Court concludes that the association's lien is junior to the home lender's lien; and, therefore, the debtors' plan may indeed "strip" the association's lien and require the association to release its lien.

The Court issues this memorandum opinion because the novel issue here is not whether a Chapter 13 plan can "strip" a homeowners' association's lien on the debtors' principal residence despite the anti-modification clause of Section 1322, but rather, whether the association expressly subordinated its lien under its own recorded documents[1]. The Court concludes that the

---

[1] There is no dispute that a Chapter 13 plan may "strip" the lien that a creditor has on the debtor's principal residence despite the anti-modification clause of § 1322(b)(2) of the Bankruptcy Code. Indeed, the Fifth Circuit has addressed this very issue in *Bartee v. Tara Colony Homeowners Ass'n (In re Bartee)*, 212 F.3d 277 (5th Cir. 2000). In *Bartee*, the homeowner (debtor) sought, pursuant to 11 U.S.C. § 506(a), to "strip off" the homeowners' association's claim under the Chapter 13 plan because the claim was an unsecured and subordinate lien on the debtor's principal residence. *Id.* at 281. The home lender held a first lien on the debtor's principal residence with a secured claim in the amount of $88,840.23. As of the date of the plan, the debtor's homestead was valued at only $87,000.00. The homeowners' association had a subordinate claim against the debtor's principal residence for a pre-petition annual assessment imposed pursuant to subdivision covenants and deed restrictions. *Id.* Not unaware of the Supreme Court's decision in *Nobelman v. American Savings Bank*, 508 U.S. 324, 332 (1993), which held that § 1322(b)(2) prohibits a bifurcation of a claim secured only by a lien on the debtor's principal residence, the Fifth Circuit upheld the confirmation of the plan which stripped the lien of the homeowners' association under § 506(a). The position that § 1322(b)(2) does not prohibit avoidance of liens associated with wholly unsecured claims has been adopted by at least five sister Courts of Appeals and two Bankruptcy Appellate Panels. *See Zimmer v. PSB Lending Corporation (In re Zimmer)*, 313 F.3d 1220, 1227 (9th Cir. 2002); *Lane v. W. Interstate Bancorp (In re Lane)*, 280 F.3d 663, 667-69 (6th Cir. 2002); *Pond v. Farm Specialist Realty (in re Pond)*, 252 F.3d 122, 126 (2d Cir. 2001); *Tanner v. FirsPlus Fin., Inc. (In re Tanner)*, 217 F.3d 1357, 1359-60 (11th Cir. 2000); *McDonald v. Master Fin., Inc. (In re MacDonald)*, 205 F.3d 606, 611 (3d Cir. 2000); *Domestic Bank v. Mann (In re Mann)*, 249 B.R. 831, 840 (B.A.P. 1st Cir. 2000); *Lam v. Investors Thrift (In re Lam)*, 211 B.R. 36, 40-41 (B.A.P. 9th Cir. 1997). In the dispute at bar, this Court adopts these holdings, and concludes that because the lien of the homeowners' association is both subordinate to the home lender's lien and a completely unsecured lien, § 506(a) and § 1322(b)(2) provide that such lien can be "stripped" and the rights of the homeowners' association modified. An unsecured junior lienholder has no right to be treated more favorably than in foreclosure.

    The undersigned judge takes note that one of his colleagues—the Honorable Karen K. Brown—concluded in *In re Koppersmith* that "[a] fundamental premise of § 506(a) is that a claim is subject to reduction in security only when the estate has an interest in the property." 156 B.R. 537, 539 (Bankr. S.D. Tex. 1993). The court held that § 506(a) "does not apply to homestead property claimed as exempt" because exempt property is not part of the bankruptcy estate. *Id.* Despite Judge Brown's ruling, the undersigned judge believes that the Fifth Circuit, in *Bartee*, strongly implied that § 506(a) does in fact apply to homestead property even if this property is exempt (and the vast majority of debtors do, in fact, exempt their homesteads after filing for bankruptcy); accordingly, the undersigned judge believes that he must adhere to the holding in *Bartee*. Thus, contrary to Judge Brown's ruling, the undersigned judge concludes that in a Chapter 13 case, where there is a first lien and a second lien on a homestead that the debtor has exempted, and the value of the homestead is equal to or less than the first lien, then §

association's recorded declaration does indeed subordinate the association's lien to the home lender's lien, notwithstanding the association's vigorous argument to the contrary.

The Court makes the following findings of fact and conclusions of law pursuant to Federal Bankruptcy Rule 7052. To the extent that any finding of fact is construed as a conclusion of law, it is adopted as such; and to the extent any conclusion of law is construed as a finding of fact, it is also adopted as such. This Court reserves the right to make additional findings and conclusions as it deems appropriate or as any party may request.

## II. FINDINGS OF FACT

1. Bryan Frazer and Trenell Frazer (the Debtors) filed their Chapter 13 petition on August 1, 2011 (the Petition Date). [Main Case Doc. No. 1]. On September 27, 2011, the Debtors filed this adversary proceeding against the Property Owners Association at Canyon Village at Cypress Springs (the Association). [Adv. Doc. No. 1].

2. The Association is organized for the purpose of caring for and maintaining the Canyon Village at Cypress Springs (the Subdivision) in order to preserve the values and amenities of the Subdivision for the benefit of present and future owners of units located within the Subdivision. The Debtors live in the Subdivision. The Association's affairs are managed by a board of directors, which is charged with the day-to-day operational responsibilities necessary to effectively operate the Subdivision, including collecting annual and special assessments. The Association is also charged with the enforcement of deed restrictions and other managerial functions set forth in its bylaws. [Assoc. Ex. No. 1].

---

506(a) allows the debtor to completely strip the second lien under a plan such that the holder of that lien becomes a totally unsecured creditor.

3

3. On September 25, 2003, the fully executed Declaration of Covenants, Conditions and Restrictions of Canyon Village at Cypress Springs, Sections One (1) and Two (2) (the Declaration) was filed and recorded in the Harris County Real Property Records under Harris County Clerk's File No. X052042. [Assoc. Ex. No. 1]. The purpose of the Declaration was to establish a uniform plan for the development, improvement, and use of any unit or property within the Subdivision and to ensure the preservation of the values and amenities for the benefit of both present and future owners of the units or properties located within the Subdivision. [Assoc. Ex. No. 1].

4. On May 6, 2008, the fully executed Annexation and Supplemental Declaration of Covenants, Conditions and Restrictions for Canyon Village at Cypress Springs, Section Ten (10) (the Section 10 Declaration) was filed and recorded in the Harris County Real Property Records under Harris County Clerk's File No. 20080229472. [Assoc. Ex. No. 1]. The Section 10 Declaration supplements the Declaration.

5. The Debtors are the record owners for the residence located at 20723 Tayman Oaks Dr., Cypress, Texas 77433 (the Property). [Main Case Doc. No. 21]. The Property is located within the Section 10 of the Subdivision. By virtue of their ownership of the Property, the Debtors are subject to the Section 10 Declaration. The Property is also subject to the prior executed and recorded Declaration, including the contractual restrictive covenants described in the documents. The Debtors have exempted the Property in Schedule C in the main case. [Main Case Doc. No. 21].

6. Under the Declaration, each lot in the Subdivision is subject to annual Assessments, secured by a lien on the applicable lot. Specifically, the Declaration provides as follows:

> Section 5.2 CREATION OF THE LIEN AND PERSONAL OBLIGATION OF ASSESSMENTS. Each Lot in the Property is hereby subjected to the Assessments as set out in this Article V, and each Owner of any Lot by acceptance of a deed therefore whether or not it shall be so expressed in such deed, is deemed to Covenant and agree to pay to the Association the Assessments. The Assessments shall be a charge on the Lot and shall be a continuing lien upon the property against which such Assessments are made. All such Assessments as to a particular property, together with interest, late charges, costs and reasonable attorney's fees, shall also be the personal obligation of the person who was the Owner of such property at the time when the Assessments fell due. The personal obligation for delinquent Assessments shall not pass to his successor in title unless expressly assumed by that successor.

7. Under the Declaration, the Association subordinates its lien to anyone who provides a purchase money loan or a construction loan—or both. Specifically, the Declaration provides as follows:

> Section 5.12 SUBORDINATION OF THE LIEN TO MORTGAGES. To secure the payment of the Assessments established hereby and to be levied on each Lot, there is hereby reserved in each deed (whether specifically stated therein or not) a vendor's lien and a contract lien for benefit of the Association, said liens to be enforceable as set forth in Article V hereof by the Board on behalf of the Association; provided, however, that each such lien shall be secondary, subordinate and inferior to all liens, present and future given, granted and created by or at the request of the Owner of any such Lot to secure the payment of monies advanced on account of the purchase price and/or the construction of improvements on any such Lot to the extent of any such Assessments accrued and unpaid prior to foreclosure of any such purchase money lien or construction lien. The sale or transfer of any Lot pursuant to purchase money or construction loan mortgage foreclosure or any proceeding in lien[2] thereof, shall extinguish the lien of such Assessment, but only as to payment which became due prior to such sale or transfer and not thereafter. Mortgagees are not required to collect Assessments. Failure to pay Assessments does not constitute a default under an insured mortgage.

---

[2] Section 5.12 of the Declaration clearly has a typographical error. Although the word in this sentence is typed as "lien," it should have been typed as "lieu." Otherwise, the sentence makes no sense.

8. On the Petition Date, the Debtors owed the Association the amount of $2,389.83. [Jan. 19, 2012, Tr. at 10:27:32-40]. Accordingly, under Section 5.2 of the Declaration, the Association had a lien on the Property of $2,389.83 as of the Petition Date.

9. As of the Petition Date, the Debtors owed Bank of America (the Bank) the amount of $114,876.00 pursuant to a promissory note executed by the Debtors on July 1, 2008. [Adv. Doc. No. 1]. The obligation owed by the Debtors to the Bank is secured by a lien pursuant to a deed of trust executed by the Debtors on July 1, 2008. The deed of trust was recorded on July 8, 2008 in the real property records of Harris County, Texas. Accordingly, as of the Petition Date, the Bank had a lien on the Property of $114,876.00. [Adv. Doc. No. 1]. There is no dispute that this loan is a purchase money loan, or that the Debtors used the loan proceeds to purchase the Property.

10. The value of the Property is approximately $104,775.00. [Adv. Doc. No. 1].

11. There has been no foreclosure on the Property, and the Debtors continue to reside at the Property. [Jan. 19, 2012, Tr. at 10:32:03-25].

12. The Debtors filed their initial Chapter 13 plan on August 19, 2011. [Main Case Doc. 22]. On September 9, 2011, the Debtors then filed an amended Chapter 13 plan. [Main Case Doc. 35]. Then, on October 14, 2011, the Debtors filed another amended Chapter 13 plan. [Main Case Doc. No. 48]. Finally, on December 7, 2011, the Debtors filed yet another amended Chapter 13 plan. [Main Case Doc. No. 52]. It is this plan that is the "live" plan (the Plan). [Main Case Doc. No. 57]. The Plan contains the following language with respect to treatment of the Association's claim:

> The amount owed to [the Association] on the second lien on the homestead is approximately $2,072.03[3]. Bank of America is its first lien holder. The amount owed to Bank of America on the first lien is approximately $114,876.00. The value of the homestead is $104,775.00. The amount owed on the first lien exceeds the value of the homestead. Consequently, the second lien of [the Association] for amounts owed pre-petition is an unsecured debt. Upon discharge under this plan, [the Association] shall release its liens, encumbrances and security interests on the Debtor's homestead for amounts owed prior to the filing of this chapter 13 plan and provide the Debtor with a release for such pre-petition amounts.

[Main Case Doc. No. 52].

13. On September 6, 2011, the Association filed an objection to the initial plan filed by the Debtors (the Objection). [Main Case Doc. No. 36]. The basis of the Objection was that the initial plan, by containing the "strip down" language set forth above, was a violation of the Bankruptcy Rules because this provision necessarily determines the extent of the Association's lien—and a determination of the extent of any lien requires the filing of an adversary proceeding[4].

14. At a hearing held on September 12, 2011 regarding the Objection, counsel for the Debtors agreed to file an adversary proceeding against the Association.

15. On September 27, 2011, the Debtors initiated the adversary proceeding pending before this Court by filing their Complaint for Determination of Lien Status and Removal and Release of Lien (the Complaint) against the Association. [Adv. Doc. No. 1]. The relief sought in the Complaint is that: (a) the Association's lien is subordinate to the Bank's lien; and (b) because the Association's lien is subordinate to the Bank's lien, and also because the Bank's lien is greater than the value of the Property, the Plan may therefore "strip" the Association's lien

---

[3] The Plan sets forth that the Association's lien is $2,072.03. However, the Association's proof of claim set forth that the lien is $2,389.83, and the Debtors do not dispute this higher figure.

[4] The provision in the initial plan which "strips" the Association's lien is also contained in each of the amended plans filed by the Debtors, including the most recently amended plan which is the "live" Plan.

such that the Association will be treated as an unsecured creditor and will be required to release its lien upon the Debtors receiving a discharge.

16. On October 3, 2011, the Association filed its Answer to the Complaint. [Adv. Doc. No. 4]. The Association requests this Court to deny all of the relief sought in the Complaint.

17. With the parties' consent, this Court held an expedited trial on January 19, 2012. At the close of the trial, the Court took the matter under advisement. The Court now issues its ruling.

### III. CONCLUSIONS OF LAW

**A.    Jurisdiction, Venue, and Constitutional Authority to Enter a Final Judgment**

1. Jurisdiction

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334(b) and 157(a). This particular dispute is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (B), (C), (K), (O), and the general "catch-all" language of 28 U.S.C. § 157(b)(2). *See In re Southmark Corp.*, 163 F.3d 925, 930 (5th Cir. 1999) ("[A] proceeding is core under section 157 if it invokes a substantive right provided by title 11 or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case."); *De Montaigu v. Ginther (In re Ginther Trusts)*, Adv. No. 06-3556, 2006 WL 3805670, at *19 (Bankr. S.D. Tex. Dec. 22, 2006) (holding that an "[a]dversary [p]roceeding is a core proceeding under 28 U.S.C. § 157(b)(2) even though the laundry list of core proceedings under § 157(b)(2) does not specifically name this particular circumstance").

2. Venue

Venue is proper pursuant to 28 U.S.C. § 1409.

3. <u>Constitutional Authority to Enter a Final Judgment</u>

Having concluded that this Court has jurisdiction over these contested matters, this Court nevertheless notes that *Stern v. Marshall*, 131 S. Ct. 2594 (2011) sets forth certain limitations on the constitutional authority of bankruptcy courts to enter final orders. This Court concludes that it has constitutional authority to sign a final order in the dispute at bar for the reasons set forth below:

> a. *The First Reason: The facts in Stern are distinguishable from the facts in the case at bar*

The facts in the case at bar are easily distinguishable from the facts in *Stern*. In *Stern*, the debtor filed a counterclaim against a creditor who had filed a proof of claim. The debtor's counterclaim was based solely on state law; there was no Code provision undergirding the counterclaim. Moreover, the resolution of the counterclaim was not necessary to adjudicating the claim of the creditor. Under these circumstances, the Supreme Court held that the bankruptcy court lacked constitutional authority to enter a final judgment on the debtor's counterclaim.

In the dispute at bar, there are both facts and law that give this Court constitutional authority to sign a final order in this proceeding. The Plaintiffs' Complaint for Determination of Lien Status and Removal and Release of Lien puts the following issue in dispute: Does the Association's lien have priority over the Bank's lien on the Debtors' homestead? There is no doubt that state law governs this issue; and in this respect, the dispute at bar is similar to *Stern*. But, that is where the similarity ends. In *Stern*, the resolution of the counterclaim filed by the debtor did not necessarily lead to a determination of the validity of the claim filed by the defendant. Here, the resolution of the dispute necessarily determines the extent of the claim held

not only by the Association, but also by the Bank. Stated differently, the resolution of the dispute necessarily determines whether the claim held by the Association will be completely secured or completely unsecured. If the Association's lien is junior to the Bank's lien, then 11 U.S.C. § 506(a) dictates that the Association has only an unsecured claim in this Chapter 13 case[5]. Thus, the dispute at bar is not only distinguishable from *Stern* because claims against the estate are being determined here; it is distinguishable because an express bankruptcy statute—i.e. § 506(a)—determines whether the Association has a secured claim or an unsecured claim. And, once this issue is resolved, all creditors in this Chapter 13 case, as well as the Chapter 13 trustee, will then be able to assess how the Debtors' Plan will treat all of the claims. This is yet one more distinguishing fact in this dispute: Unlike *Stern*, the resolution of this dispute will crystallize the treatment of all claims under the Plan. For all of these reasons, this Court concludes that *Stern* has no application and that this Court has the constitutional authority to enter a final order in this adversary proceeding.

> b. *The Second Reason: Even if Stern Applies, the "Public Rights" Exception Articulated in Stern Applies in the Case at Bar*

In the alternative, even if *Stern* somehow applies, this Court concludes that the one exception articulated in *Stern* by the Supreme Court applies—specifically, that this Court may enter a final order over essential bankruptcy matters under the "public rights" exception. Under *Thomas v. Union Carbide Agric. Prods. Co.*, a right closely integrated into a public regulatory

---

[5] Section 506(a) of the Bankruptcy Code sets forth that the holder of an allowed claim secured by a lien on property of the estate has a secured claim in the bankruptcy only to the extent of the value of the lienholder's interest in the property. Here, the Property is worth $104,775.00, and the lien held by the Bank totals $114,846.00. Hence, if the Association's lien is junior to the Bank's lien, there is absolutely no equity. Thus, the value of the Association's lien is zero, which means that the Association has only an unsecured claim.
   The undersigned judge wants to emphasize that even though the Debtors have exempted the Property—which means that the Property is no longer property of the estate—section 506(a) nevertheless applies for purposes of stripping the Association's lien. As stated in footnote no. 1, the Court makes this conclusion due to the Fifth Circuit's holding in *Bartee*.

10

scheme may be resolved by a non-Article III tribunal. 473 U.S. 568, 593 (1985). The Bankruptcy Code is a public scheme for restructuring debtor-creditor relations, necessarily including "the exercise of exclusive jurisdiction over all of the debtor's property, the equitable distribution of that property among the debtor's creditors, and the ultimate discharge that gives the debtor a 'fresh start' by releasing him, her, or it from further liability for old debts." *Cent. Va. Cmty. Coll. v. Katz*, 546 U.S. 356, 363–64 (2006); *see N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 71 (1982) (plurality opinion) (noting in dicta that the restructuring of debtor-creditor relations "may well be a 'public right'"). *But see Stern*, 131 S. Ct. at 2614 n.7 ("We noted [in *Granfinanciera*] that we did not mean to 'suggest that the restructuring of debtor-creditor relations is in fact a public right.'").

The key issue before this Court involves a dispute over whether the Association's lien or the Bank's lien has priority. The right to determine priority of claims on the bankruptcy estate is established by provisions of the Bankruptcy Code (sections 503(b), 506(a), and 507(a)) and is central to the public bankruptcy scheme, as it relates to the equitable distribution of property among a debtor's creditors. As such, this determination is not only inextricably tied to the bankruptcy scheme, but it also involves the adjudication of rights created by the Bankruptcy Code. For these reasons, this matter falls within this Court's authority, and therefore this Court may enter a final order on the Plaintiffs' Complaint for Determination of Lien Status and Removal and Release of Lien.

**B. The Plain Meaning of the Language in Section 5.12 of the Declaration Indicates That the Association's Lien is Subordinate to the Bank's Lien at all Times**

Under Texas contract law, "when construing a contract, the court's primary concern is to give effect to the written expression of the parties' intent." *Forbau v. Aetna Life Ins. Co.*, 876

S.W.2d 132, 133 (Tex. 1994). A contract "is to be construed in accordance with its plain language." *Gen. Am. Indem. Co. v. Pepper*, 161 Tex. 263, 339 S.W.2d 660, 661 (1960). Where the words in a contract are "clear and unambiguous," the rules of construction are not to be applied." *Id.* The unambiguous words of a contract are deemed to "express the intention of the parties, because objective, not subjective, intent controls." *Derr Constr. Co. v. City of Houston*, 846 S.W.2d 854, 861 (Tex. App.—Houston [14th Dist.] 1992). Accordingly, the Court will look first to the language of the Declaration to determine how the Association's assessment lien is to be characterized with regards to the Bank's lien.

> Section 5.12 of the Declaration states:
>
> SUBORDINATION OF THE LIEN TO MORTGAGES. To secure the payment of the Assessments established hereby and to be levied on each Lot, there is hereby reserved in each deed (whether specifically stated therein or not) a vendor's lien and a contract lien for benefit of the Association, said liens to be enforceable as set forth in Article V hereof by the Board on behalf of the Association; provided, however, that each such lien shall be secondary, subordinate and inferior to all liens, present and future given, granted and created by or at the request of the Owner of any such Lot to secure the payment of monies advanced on account of the purchase price and/or the construction of improvements on any such Lot to the extent of any such Assessments accrued and unpaid prior to foreclosure of any such purchase money lien or construction lien. The sale or transfer of any Lot pursuant to purchase money or construction loan mortgage foreclosure or any proceeding in lien thereof, shall extinguish the lien of such Assessment, but only as to payment which became due prior to such sale or transfer and not thereafter. Mortgagees are not required to collect Assessments. Failure to pay Assessments does not constitute a default under an insured mortgage [emphasis added].

[Finding of Fact No. 7]. The plain meaning of the emphasized language unambiguously states that assessment liens are subordinate to purchase money liens to the extent that any assessments are accrued and unpaid prior to foreclosure of any purchase money lien.

The Association contends that its lien is subordinate to the Bank's lien—or, for that matter, to the lien of any home lender—<u>only</u> if the home lender <u>actually</u> forecloses on the Property[6]. And, so the Association's argument goes, because there has been no foreclosure on the Property [Finding of Fact No. 11], its lien is superior to the Bank's lien. In support of this argument, the Association cites the following emphasized language from Section 5.12 of the Declaration:

> . . . provided, however, that each such lien shall be secondary, subordinate and inferior to all liens, present and future given, granted and created by or at the request of the Owner of any such Lot to secure the payment of monies advanced on account of the purchase price and/or the construction of improvements on any such Lot <u>to the extent of any such Assessments accrued and unpaid prior to foreclosure of any such purchase money lien or construction lien</u> [emphasis added].

According to the Association, the emphasized language above severely limits the circumstances under when the Association's lien becomes subordinate to the Bank's lien. The Association construes this emphasized phrase to mean that the Bank has to <u>actually</u> foreclose on the Property for the subordination to occur. Stated differently, the Association's position is that if it was simply unconditionally subordinating its lien to the Bank's lien, there would be no need for the emphasized language to be included in Section 5.12. Rather, the provision would simply read as follows:

---

[6] In the first instance, the Association argues that lien priority is determined under applicable state law. The Debtors do not dispute that state law governs lien priority. There is also no question that under Texas law, a creditor has a lien that is superior to the lien of another creditor if the first creditor's lien arose prior to the lien of the second creditor. *National City Bank v. Texas Capital Bank*, 353 S.W.3d 581, 584 (Tex. App.—Dallas, 2011). Because the Association's lien arose in 2003, which was five years before the Bank's lien arose, the Association contends that it has a superior lien to the Bank's purchase money lien. The Debtors do not dispute that the Association's lien is first in time, nor do they dispute the legal point that "first in time" prevails. Rather, the Debtors argue that the very language in Section 5.12 of the Declaration is a voluntary subordination by the Association of its lien to the Bank's lien. Thus, the dispute centers around the interpretation of the subordination language in Section 5.12 of the Declaration.

> . . . provided, however, that each such lien shall be secondary, subordinate and inferior to all liens, present and future given, granted and created by or at the request of the Owner of any such Lot to secure the payment of monies advanced on account of the purchase price and/or the construction of improvements on any such Lot.

The Court disagrees with the Association's interpretation of this emphasized language for two reasons. First, the only reason there is a reference to foreclosure is this: it is at this time that a home lender would be most worried about its lien being junior to the Association's lien. If the homeowner is making timely payments to the lender, there is no foreclosure on the horizon, and therefore the lender is not worried about its lien being inferior even though the Association's lien was first in time. Conversely, if there is a foreclosure on the horizon, the lender would be worried that its lien is inferior to the Association's lien due to the "first in time" rule; and that is exactly why the emphasized language is inserted in Section 5.12: It allays the fears of any home lender because the Association is expressly subordinating its lien if the lender ever has to foreclose.

Second, the emphasized language must be read in conjunction with the next sentence, which reads as follows: "The sale or transfer of any Lot pursuant to purchase money or construction loan mortgage foreclosure or any proceeding in lien[7] thereof, shall extinguish the lien of such Assessment but only as to payment which became due prior to such sale or transfer and not thereafter." Taken together, these two sentences put all third party purchasers on notice that the Association's lien can arise in the future if they buy the Property at foreclosure and thereafter fail to pay the fees due to the Association. Stated differently, these two sentences telegraph the following message to third parties who are interested in buying the Property: If you do in fact purchase the Property at foreclosure, and then you default on assessments, a lien

---

[7] *See supra* note 2 (explaining how the word "lien" should really be the word "lieu" on this line).

will arise in favor of the Association; and you cannot argue that the Association has no right to a lien on the grounds that when you purchased the Property at a foreclosure sale, the Association's lien arising from the prior owner's failure to pay was extinguished.

This interpretation that the Association's subordination is unconditional is not only correct, but it comports with actual lending practices in the home lending industry. No reasonable lender would extend a loan if it knows that a homeowners' association's lien can be superior to that of the lender at any point when the homeowner is in default to the lender, or at any point when the homeowner is in default to the association. Indeed, no reasonable homeowners' association would contend that its lien is ever superior to a purchase money lien if that association wants to encourage the purchase, construction, and subsequent maintenance of houses within the subdivision for which the association is responsible.

The weakness in the Association's argument in the case at bar can be underscored by reference to Texas foreclosure law. Under Texas law, an "inferior lienholder is not entitled to notice of a foreclosure by a prior incumbrancer or senior lienholder." *Jones v. Bank United of Texas, FSB*, 51 S.W.3d 341, 344 (Tex. App.—Houston 2001). The law is therefore that first lienholders are <u>not</u> required to give junior lienholders notice of the foreclosure sale. It is not in the ordinary course of the business of home lenders to give notice of scheduled foreclosure sales to anyone but the homeowner. Yet, the Association's position would completely change this ordinary course of business and require home lenders to give notice of a foreclosure sale to homeowners' associations. Such a sea change in business practices cannot occur without language in a homeowners' association's declaration that is clearer and more conspicuous than the language in Section 5.12 of the Declaration. For this Court to give the Association its

requested lien priority "in the absence of clear language as to that effect would undermine the principle of notice embodied in the recordation and registration statutes." *Fed. Nat'l Mortg. Ass'n v. McKesson*, 639 So.2d. 78, 79 (Fla. Dist. Ct. App. 1994). Accordingly, for all of the reasons set forth above, the Court concludes that the Association's assessment lien is subordinate to the Bank's lien. As the amount owed on the Bank's lien exceeds the value of the Property, the Association's lien is completely "underwater"—i.e. has no value—and may therefore be "stripped" under the Plan.

### C. The Debtors Are Not Entitled to Attorney's Fees Because They Failed to Request Them in Their Pleadings

The Federal Rules of Bankruptcy Procedure require a party who seeks to recover attorney's fees to assert a claim for such fees in her complaint, answer, cross-claim, or third-party complaint. Fed. R. Bankr. P. 7008(b). Proper pleading for attorney's fees is necessary to "put the parties and the court on notice that attorney['s] fees are at issue." *United Industries, Inc. v. Simon Hartley, Ltd.*, 91 F.3d 762, 765 (5th Cir. 1996). It is insufficient for a party to solely demand attorney's fees in the prayer for relief. *In re Ramsey*, 424 B.R. 217 226 (Bankr. N.D. Miss. 2009) (citing *In re DeMaio*, 158 B.R. 890 (Bankr. D. Conn. 1993)). Further, a request for "costs" is not a sufficient pleading for attorney's fees. *Id.*

Here, the Plaintiffs failed to assert a claim for attorney's fees in their complaint. In their prayer for relief the Plaintiffs do request "such other and further consideration to which Plaintiffs may justly be entitled." [Adv. Doc. No. 1]. However, even if this is an ambiguous demand for attorney's fees, it is insufficient as it is only in the prayer for relief. Accordingly, the Court concludes that the Plaintiffs are not entitled to recover the attorney's fees that they have incurred for the prosecution of this adversary proceeding.

## IV. CONCLUSION

Home lenders such as the Bank in the dispute at bar are well aware, and do readily accept, that *ad valorum* tax liens in Texas are superior to their liens. But, the home lending industry does not accept that the lien of a homeowners' association could ever trump a purchase money lien. And, if such is ever to be the case, the home lender must be put on clear, conspicuous, and unequivocal notice. Here, the Association's recorded documentation provides no such notice. Indeed, the subordination language in Section 5.12 of the Declaration points to the Association's lien always being subordinate to any home lender's lien. And, because the Court concludes that the Association's lien is always subordinate to the Bank's lien, the Court concludes that the Debtors' Plan may strip the Association's lien on the Property such that the Association becomes an entirely unsecured creditor for purposes of distributions to be made under the Plan.

Finally, because the Debtors failed to request attorney's fees in their pleadings or otherwise place the Association on notice that they would seek to recover their attorney's fees, the Debtors are not entitled to recover the fees that they have incurred in this adversary proceeding.

A judgment consistent with this Opinion will be entered on the docket simultaneously with the entry on the docket of this Opinion.

Signed on this 5th day of March, 2012.

Jeff Bohm
United States Bankruptcy Judge